**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MARY M. MILLER,**

     **Plaintiff,**

**vs.**                            **CIVIL ACTION NO. 3:20-CV-00352**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

       This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered May 22, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 13, 18)

       Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or for remand (ECF No. 13); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 18); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

<u>**Procedural History**</u>

The Plaintiff, Mary M. Miller, (hereinafter referred to as "Claimant"), protectively filed her applications on February 13, 2018 (Tr. at 275-278, 279-287) alleging disability since October 15, 2016[1] because of irritable bowel syndrome, COPD, kidney problems, muscle spasms in legs and back, stomach problems, high blood pressure, back and neck problems, depression, and anxiety (Tr. at 315). Her claims were initially denied on May 7, 2018 (Tr. at 172-1782, 183-193) and again upon reconsideration on May 21, 2018 (Tr. at 199-206, 207-213). Thereafter, Claimant filed a written request for hearing on June 5, 2018 (Tr. at 214).

An administrative hearing was held on March 13, 2019 before the Honorable Neil Morholt, Administrative Law Judge ("ALJ") (Tr. at 35-75). On May 1, 2019, the ALJ entered an unfavorable decision (Tr. at 10-33). On July 2, 2019, Claimant sought review by the Appeals Council of the ALJ's decision (Tr. at 272-274). The ALJ's decision became the final decision of the Commissioner on March 26, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On May 21, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 13), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 18). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was considered a "younger person" on the amended alleged onset date, but then

---

[1] Claimant had initially alleged an onset date of July 5, 2012, but amended the alleged onset date to the day after a prior unfavorable decision. (Tr. at 13, 301; see also Tr. at 142-162)

changed age categories, to a "person closely approaching advanced age" during the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c); 404.1563(d), 416.963(d). (Tr. at 27) Claimant went as far as the eighth grade in school, but did not complete the grade, she tried to get her GED, but flunked the math portion; Claimant can read and write and do simple math, however. (Tr. at 46-47) Claimant last worked in the fast-food industry in 2012. (Tr. at 88, 103, 324-327)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>     (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination

5

and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

### Summary of ALJ's Decision

In this case, the ALJ found Claimant met the insured status requirements through June 30, 2017. (Tr. at 16, Finding No. 1) At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since the amended alleged onset date of October 15, 2016. (Id., Finding No. 2) At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease the cervical and lumbar spine; status post bilateral carpal tunnel release surgeries; migraines; gastroesophageal reflux disease; gastritis; ulcer; depression; anxiety; and post-traumatic stress disorder. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except she can:

> occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle, finger, and feel bilaterally; frequently reach overhead bilaterally; should avoid all exposure to unprotected heights, moving mechanical parts, outdoor jobs and no exposure to loud noise levels; and can have occasional exposure to dust, fumes, odors, gases, other pulmonary irritants, extreme heat, and humidity. Mentally, the claimant can: understand, remember, and carry out simple, routine, repetitive, one to two step instructions/tasks in a routine work setting having minimal variations as well as no fast-paced production requirements; frequently interact with supervisors, coworkers, and the general public; and sustain attention and concentration for low stress jobs (which is defined as occasional decision making).

 (Tr. at 20, Finding No. 5) At step four, the ALJ found Claimant was not capable of performing any of past relevant work. (Tr. at 27, Finding No. 6) However, in addition to the immateriality of

the transferability of job skills, based on Claimant's age, education, work experience, and RFC, the ALJ determined that Claimant is capable of performing other jobs that exist in significant numbers in the national economy. (Tr. at 27-28, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability since October 15, 2016 through the date of the decision. (Tr. at 29, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ's decision is not supported by substantial evidence because he failed to properly consider the medical evidence regarding her mental and physical impairments and incorporate same into the credibility determination and RFC analysis. (ECF No. 13 at 6-7). Claimant recites numerous diagnoses of record, including those provided by consulting examiners and a treating source, demonstrate she is incapable of performing substantial gainful activity. (Id.) The ALJ should have accepted the testimony of the vocational expert who opined Claimant is incapable of substantial gainful activity if she were absent more than once a day per month or off task more than 10% of the workday; Claimant would need frequent absences and breaks due to her depression, anxiety and chronic diarrhea, which requires adult diapers – the ALJ erred by not considering the vocational impact of her chronic diarrhea and instead found it to be a nonsevere impairment. (Id.) The ALJ also erred by not finding Claimant "grids out" on her fiftieth birthday. (Id. at 7) Claimant asks for reversal with an award for benefits, or for remand. (Id. at 7-8)

In response, the Commissioner asserts that Claimant carried the burden of proving disability, and failed to do so. (ECF No. 18 at 3-4) Additionally, the Commissioner contends that the RFC assessment is supported by substantial evidence and with regard to Claimant's physical and mental impairments, the ALJ examined the relevant records and determined Claimant's

impairments were not disabling – Claimant fails to prove any greater functional limitations not accounted for in the RFC. (Id. at 5-6) With respect to Claimant's stomach issues, the ALJ noted testing revealed minimal findings and that Claimant failed to follow up with recommended referrals and prescribed medication. (Id. at 7) Additionally, the ALJ noted Claimant had a history of noncompliance with treatment. (Id.) The ALJ also properly considered the opinion evidence, as well as Claimant's subjective complaints when assessing her RFC, noting Claimant was capable of performing activities of daily living. (Id. at 7-9) The ALJ did not have to accept the vocational expert's testimony based upon assumed limitations not supported in the record; additionally, the ALJ found Claimant remained capable of light work, thus Claimant is not disabled pursuant to the vocational grid rules. (Id. at 9) Finally, the Commissioner contends that substantial evidence supported the ALJ's decision and asks this Court to affirm. (Id. at 9-10)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Evidence Related to Physical Impairments:

At the second step in the sequential evaluation process, the ALJ considered Claimant's high blood pressure, noting she was diagnosed with hypertension following an examination in November 2017 and that a June 2018 chest x-ray was unremarkable. (Tr. at 16, 828, 785) The ALJ noted Claimant had mentioned medication usually controls her high blood pressure and the record shows no evidence of a cardiac event, accordingly, the ALJ found this impairment was nonsevere. (Tr. at 16)

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Treatment for Stomach Issues:

 In January 2014, Claimant underwent testing of her abdomen due to complaints of pain and vomiting; findings were consistent with mild reflux esophagitis. (Tr. at 21, 1022) During a follow-up appointment at Holzer Family Clinic in May 2014, Claimant was noted to have stomach problems due to underlying anxiety causing gastritis; she was prescribed medication. (Tr. at 21, 889) In October 2014, Claimant's reflux was noted to be stable on medications. (Tr. at 21, 887) A CT scan in February 2015 revealed normal findings. (Tr. at 21-22, 572) During a follow-up visit, Claimant reported increased depression due to stomach problems. (Tr. at 22, 568) By March 2015, Claimant reported that her stomach problems were worsening due to increased anxiety (Tr. at 22, 873), however, a HIDA scan revealed normal findings (Tr. at 22, 567).

During a return visit in June 2015, Claimant complained she was unable to keep anything down, but admitted she had not followed up with Cleveland Clinic as scheduled. (Tr. at 22, 864) She also thought her upset stomach might be due to her nerves, as one son was in jail and another was on heroin. (Id.) She was provided a trial of Zofran, though stated she could not keep it down long enough for it to work. (Id.)

Claimant returned in August 2015 and reported she had recently lost her insurance, resulting in her being off her medications. (Tr. at 22, 861) An EGD in November 2015 revealed three small ulcers; the overall assessment was peptic ulcer, duodenal ulcer, and acute gastritis without hemorrhage. (Tr. at 22, 642, 647-648) Subsequent testing indicated antral mucosa with mild chronic focally active gastritis and changes of a healing ulcer. (Tr. at 22, 1019)

During a follow up appointment at Holzer in February 2016, Claimant reported that her insurance would not pay for further stomach workup despite ongoing nausea, pain, and vomiting.

9

(Tr. at 22, 850-852) She also complained of increased depression due to marital problems; she indicated she was going to leave her husband and reported he was the source of a lot of her problems. (Tr. at 22, 847) She later reported in August 2016 that medications were not helping her depression, but she had established care with Prestera (Tr. at 22, 841); by December 2016 she reported a recent endoscopy was cancelled due to swelling in her esophagus (Tr. at 22, 831).

In September 2018, Claimant was referred to Akash Ajmera, M.D., for an assessment of her allegations of abdominal pain and persistent vomiting over the past five years. (Tr. at 23, 628-632) No acute findings were evidence and Claimant was advised to stop consuming carbonated or sweet drinks and artificial sweeteners. (Tr. at 23, 631) In January 2019, Claimant underwent additional testing secondary to her ongoing complaints of stomach pain; again, results were unremarkable with no obstructive features. (Tr. at 23, 1001) During a follow up visit to Holzer Clinic, Claimant was noted to have mixed anxiety, depressive disorder, and polyneuropathy for which her medications were adjusted; by February 2019, she was noted to have muscle pain, sciatica, and anxiety. (Tr. at 23, 770, 765)

Mental Health Treatment:

In December 2015, Claimant presented to Prestera Mental Health with complaints of depression so severe that she was having problems getting out of bed. She also reported flashbacks regarding abuse she had suffered as a child. (Tr. at 23, 387) The following month Claimant reported increased stress as one son was in jail and the other was on heroin; she was noted to be pleasant, talkative, and laughing during the session. (Tr. at 23, 389) The overall impression was severe major depressive disorder and her medications were continued. (Tr. at 23, 391) In May 2016, Claimant returned and reported sleeping better with prescribed Seroquel, but ongoing

10

irritability and crying spells. (Tr. at 23, 429) By July 2016, she reported marital problems, which were increasing her depression and anxiety symptoms. (Tr. at 23, 439) When she returned in October 2016, Claimant reported that she is not as upset and angry after moving out of the house and away from her husband, also her IBS is improved and she is not as nauseated; she told the examiner she wanted to try to get her GED. (Tr. at 23, 454)

During a follow up visit in March 2017, Claimant admitted she stopped taking Seroquel after her dosage had been increased because she was having a seizure like episode and heart fluttering; she was not having the same symptoms after stopping it. (Tr. at 23, 464) She reported increased depression, anxiety, insomnia, and anger, though she was noted to have a normal mood, memory, and affect. (Id.) In April 2017, she also admitted stopping Abilify because it made her more anxious, but did not want to try a new medication because she was going out of town due to her mother's health. (Tr. at 23, 472) Upon her return in June 2017, Claimant reported doing relatively well; the examiner noted, however, that Claimant had not attended counseling sessions for almost two years. (Tr. at 23, 474, 505) In August 2017, Claimant's mood was reportedly "good" and that she reported Lexapro "helps a lot" and was using her leftover Seroquel for sleep. (Tr. at 23, 480, 482) However, when she returned in November 2017, Claimant reported increased depression and anxiety due to worry over her children. (Tr. at 23, 484)

Claimant returned to Prestera in May 2018 and reported being constantly worried about her children, but that Lexapro "helps a lot" (Tr. at 24, 976-978). However, by September 2018, Claimant reported being very depressed and complained about scattered thoughts and that Lexapro was no longer helping; she was noted to be pleasant and cooperative and her thoughts were within normal limits. (Tr. at 24, 979-980) In October 2018, Claimant reported she had been in Dayton

with her mom for the past two weeks; she told the examiner that she had been feeling agitated and angry and that she was hearing voices and having racing thoughts, although her attention and concentration were noted to be normal during the exam. (Tr. at 24, 983) During a follow up in December 2018, Claimant's speech was noted to be slightly rapid and her voice was slightly loud, however, she reported her anxiety was manageable and that her depression had improved. (Tr. at 24, 986) The examiner noted Claimant was smiling and laughing during the session and that her affect had improved since the last visit. (Id.) By February 2019, however, Claimant reported she was under a lot of stress and had a hard time sleeping: her mother died yesterday; her father-in-law died today; her son is in prison and beaten badly by the guards; the examiner noted she was well groomed and cooperative during the session and her memory was within normal limits. (Tr. at 24, 990)

Consultative Examiner Findings:

In April 2018, Claimant presented to Emily Wilson, M.A., consultative examiner, with complaints of mental health issues. (Tr. at 23-24, 507-512) Claimant reported she was applying for benefits because of "my illnesses and medications for IBS" and that this was the seventh time she is applying for benefits. (Tr. at 507) Ms. Wilson noted Claimant's posture and gait were within normal limits and that she was neatly and casually dressed with good grooming and hygiene. (Id.) Claimant reported that had loss of interest, irritability, hearing voices, and crying spells; she also reported that she suffered sexual abuse as a child and as a result, she had nightmares and flashbacks. (Tr. at 508) Claimant reported she never abused alcohol, used illicit drugs, or abused prescription drugs (Tr. at 509), but also admitted she was arrested 30 years ago for DUI and public

intoxication (Tr. at 510). She reported that she dropped out of school due to pregnancy and had two children by the age of 17. (Tr. at 509)

Ms. Wilson noted Claimant interacted appropriately and cooperative, though she appeared somewhat angry and occasionally raised her voice to a loud volume; she frequently expressed frustration and anger about her situation. (Tr. at 510) The mental status examination revealed Claimant had broad affect; normal thought processes and thought content; somewhat below average insight and judgement within normal limits; no current suicidal or homicidal ideation; her immediate, remote memories were within normal limits, but recent memory was below average; her concentration and pace were within normal limits and persistence was average. (Id.)

Ms. Wilson assessed major depressive disorder, single episode, severe, with anxious distress and posttraumatic stress disorder. (Id.) She gave Claimant a fair prognosis, if she were able to obtain consistent and appropriate psychotropic and psychological intervention and if awarded benefits, she was capable of managing same. (Tr. at 511)

Also in April 2018, Claimant underwent an internal medicine examination with Kip Beard, M.D., on behalf of the Agency. (Tr. at 513-523) Claimant presented with complaints of neck, middle back, lower back and tailbone pain that has persisted for more than 25 years, rating 10 out of 10, no radiation or weakness, but aggravated by physical activity such as bending and standing, no alleviating factors were reported. (Tr. at 513) Claimant also endorsed breathing problems for about a year, with symptoms including dyspnea after 5 to 10 minutes of level ground ambulation or 12 steps on a flight of steps. (Id.) Claimant also reported IBS with diarrhea prominent and frequent bathroom visits with fecal urgency and fecal incontinence; Claimant reported getting up

every two hours at night to defecate, which interferes with sleep and throughout the day with her presence at her workstation. (Id.)

Dr. Beard noted Claimant presented without ambulatory aids and that she appeared stable at station unassisted; her gait was stable and normal in pace and normal in appearance. (Tr. at 514) She could arise from a chair and step up and down from the examination table without difficulty; she could walk on the heels, on the toes, tandem walk and stand on one leg alone and could squat fully. (Id.) Testing revealed normal range of motion. (Tr. at 515-516)

Dr. Beard noted Claimant's abdomen appeared nondistended, without tenderness, guarding or rebound and organomegaly was not present. (Tr. at 514)

Dr. Beard observed Claimant's hands were without pain, tenderness, redness, warmth or swelling, or atrophy; she could make a full fist, write with the dominant hand and pick up a coin with either hand without difficulty, and could tie a string and button using both hands. (Tr. at 515)

Dr. Beard's overall impression was cervicalgia; pain in the thoracic spine and low back; coccydynia; intervertebral disc degeneration according to history; COPD; irritable bowel syndrome, diarrhea predominant; and fecal incontinence, according to history. (Tr. at 518)

Treating Source Opinion Evidence:

By letter dated June 1, 2017, Alicia Johnson, PA-C, of Holzer Clinic, reported that Claimant was a patient dealing with chronic pain and respiratory issues and was also being treated for urinary problems; Ms. Johnson opined that Claimant "is unable to do physical labor for any extended amount of time due to these conditions." (Tr. at 25-26, 608) In another letter dated January 21, 2019, Ms. Johnson reported she had been treating Claimant for frequent COPD exacerbations as well as chronic pain issues; "[d]ue to her poor health I do not feel that she can

work at this time. She has also been diagnosed with mental issues which would make working with the public difficult." (Tr. at 26, 745)

**The Administrative Hearing**

Claimant Testimony:

Claimant complained about her medical treatment, testifying that she is on so many pills that she can't function; she stated she told her doctor about it, but they "keep putting more on me." (Tr. at 48) She is a lifelong smoker, was up to two packs a day, but has cut down to two cigarettes per day with help from Chantix. (Tr. at 48-49) She used to have a drinking problem, and lost her driver's license from driving on a suspended license due to a DUI, but that had been about 30 years ago. (Tr. at 49, 68-69)

With regard to her IBS, Claimant testified that she has constant pain and has diarrhea all night and all day; she gets up in the middle of the night, about every hour or two. (Tr. at 50, 51) Sleeping pills don't work and she is unable to go out to eat or go on trips and has no life outside of the house because she is unable to control it. (Tr. at 50) She testified that she wears Depends, and wears them if she knows she's going to go out; she stated she has accidents twice a week. (Tr. at 50-51) She stated she can be in the bathroom up to ten minutes, because it depends on what she eats; she changed her diet over the last seven years and takes medication, however, the medication no longer helps. (Tr. at 51) She testified that if she doesn't take her medication, then she'll vomit; she feels nauseated all the time, but the medication controls the vomiting. (Tr. at 52)

Claimant testified that for her breathing problems, she does four nebulizer treatments a day because she gets shortness of breath easily. (Tr. at 53) She also takes high blood pressure medication, but it seems to be controlled somewhat. (Id.)

15

Claimant testified she has kidney problems due to having been on antibiotics for three years and from frequent bladder, urinary tract or kidney infections; she's undergoing tests to see what the problem is. (Tr. at 53-54)

Regarding Claimant's spinal issues, she testified that she has "deterioration" in her neck and sciatica on the right side and has pain in her neck and lower back for which she takes tramadol; she testified that she also gets muscle spams in her legs. (Tr. at 54-55)

Claimant stated that her bilateral carpal tunnel syndrome release surgeries were a success "for up to a couple months ago" and her hand is starting to tingle a little every now and then. (Tr. at 55) Claimant also has migraines once a month, requiring her to stay in darkness for three days, however, she does not take anything for her migraines. (Tr. at 55-56)

Claimant testified that she has difficulty with her memory, but does not need help or prompting to take her medications, although she does need reminders of her doctor appointments. (Tr. at 56-57) She stated that at least once a day she will have trouble with her concentration, attention or focus; she has difficulty with stress as well, the biggest stressor being her two sons are in prison. (Tr. at 57-58) She testified that with completing tasks, it depends on if she's feeling good or not. (Tr. at 58) She thinks her medications make her "mean sometimes"; she's not a sociable person and has difficulty with the general public. (Id.) She testified that she is depressed all the time, causing her diminished interest in activities, fatigue, feelings of worthlessness and guilt and thoughts of suicide. (Tr. at 64-65)

Claimant testified that she gets worn out several times a day and will just try to take a nap. (Tr. at 59) She stated she doesn't have good days, because she's always in pain, but some days

when she gets out of bed, she will wash dishes and tries to help out, but she "can't move" her feet or stand up because her medication makes her dizzy all the time. (Tr. at 60)

She estimated she could walk about two blocks before having to stop for a few minutes, and she is unable to stand for more than ten minutes or "barely" lift a gallon of milk because her back hurts her. (Tr. at 61)

On a normal day, Claimant testified that she will get up around 8 or 9 in the morning and feed her cat and return to bed; she sometimes tries to have lunch, and she goes to the bathroom all the time or she's on the couch. (Tr. at 62) She has no difficulty with personal hygiene or dressing herself, but will have her sister, who she lives with, listen for her in the shower in case she passes out. (Tr. at 62-63) She has no hobbies, does not get out of the house much and does not go to see family or friends. (Tr. at 63-64)

Claimant testified that she could not work because of her stomach problems, because she needs to go to the bathroom too often; she stated that she was fired from her job as a call representative, which was a sedentary job, because she kept having to get up and go to the bathroom. (Tr. at 66-67, 70)

Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a person of Claimant's age, education, and work experience who could perform light work; occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds, can occasionally balance, stoop, kneel, crouch and crawl, must avoid all exposure to unprotected heights and moving mechanical parts, can frequently handle, finger and feel bilaterally, can frequently reach overhead bilaterally, must avoid all exposure to outdoor jobs and no exposure to loud noise levels, can understand, remember and carry out simple, routine,

repetitive one to two-step instructions and tasks in a routine work setting having no variations, as well as no fast paced production requirements, can frequently interact with supervisors, coworkers and the general public and can sustain attention and concentration for low stress jobs which are defined as occasional decision making; and can occasionally be exposed to dust, fumes, odors, gases, any other pulmonary irritants, extreme heat and humidity. (Tr. at 71) In response, the VE testified that while the individual could not perform Claimant's past relevant work because those jobs required more than one or two or three-step tasks and too many shifts during the day of various kinds of stresses, the individual could perform the work of a packager, sorter, and inspector. (Tr. at 71-72) The VE also testified that if the individual required restroom breaks that impacts production to the extent of being off-task more than 10% of the day, then this would begin to be an accommodation, otherwise, the individual would not be able to perform past work or any jobs in the national economy. (Tr. at 72-73)

### Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

## Analysis

There are two relevant periods at play in this case:

In terms of her application for DIB, Claimant must show that she became disabled prior to the expiration of her insured status on June 30, 2017. The DIB program provides for payment of disability benefits to individuals who are "insured" by virtue of their contributions to the Social Security trust fund through Social Security tax on their earnings. 20 C.F.R. §§ 404.110, 404.315. To be entitled to DIB in this case, Claimant bears the burden of showing that she became disabled prior to June 30, 2017, the date when her insured status expired for the purposes of DIB. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after her date last insured will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). See also Jenkins v. Astrue, No. 3:10cv705, 2012 WL 3776370, at *3 n.6 (E.D. Va. Apr. 25, 2012) (citing Matullo v. Bowen, 926 F.2d 240, 246 (3d Cir. 1990)) (explaining that a worsened condition or a new impairment arising after the date last insured cannot be a basis for remand or an award of disability benefits). Therefore, the relevant period for purposes of DIB is from October 15, 2016, the date of Claimant's amended alleged disability onset, to June 30, 2017 when her insured status expired (Tr. at 14).

In terms of her application for SSI, the relevant period is somewhat longer, from the application filing date of February 8, 2018 through the date of the decision, May 1, 2019. (Tr. at

29); see also, 20 C.F.R. §§ 416.335, 416.340.

Determining Severity of Impairments:

As an initial matter, although Claimant lists her numerous conditions and ailments found throughout the medical record, at no time does she specify how these conditions, either singly or in combination, have affected her functioning.[3] Courts within this Circuit have long recognized, however, that a diagnosis or medical condition is not necessarily disabling; there must be a showing of a related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (internal citation omitted). Further, Claimant also does not specify which impairment specifically meets or equals any Listing. As noted *supra*, Claimant bears the burden of proving she has an impairment or combination of impairments that meets or medically equals the severity of Listing requirements. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).[4]

The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

---

[3] Claimant asserts that she suffers from the following: degenerative disc disease of the cervical and lumbar spine; status post bilateral carpal tunnel release surgeries; migraines; gastroesophageal reflux disease; gastritis; ulcer; depression; anxiety; post-traumatic stress disorder; high blood pressure; obesity; seasonal allergies; chronic obstructive lung disease; hemorrhoids; chronic diarrhea requiring adult diapers; skin rash; cocaine dependence in remission; and urinary tract infections. (ECF No. 13 at 5) See, e.g., 20 C.F.R. §§ 404.1521, 416.921 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).")

[4] The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

See 20 C.F.R. §§ 404.1523(c), 416.923(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. §§ 404.1525(a), 416.925(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that her combination of impairments is "equivalent" to a listed impairment, and she "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. Claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

Claimant also asserted that the ALJ determined her "chronic diarrhea is nonsevere." (See ECF No. 13 at 7) A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1522(b), 416.922(b). The Regulations provide examples of these activities: (1) physical functions such as

walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984); see also 20 C.F.R. §§ 404.1522(a), 416.922(a) (an impairment or combination of impairments is not severe if it does not significantly limit an individual's physical or mental ability to do basic work activities).

At the second step in the sequential evaluation process, the ALJ acknowledged Claimant's allegations that she has chronic diarrhea, that it affects her ability to function due to having a bowel movement every two hours, that she gets up all through the night to use the bathroom and wears Depends when she leaves the home, and that her prescribed medication is no longer effective at controlling her diarrhea. (Tr. at 17) The ALJ also considered the medical evidence that Claimant had reported chronic diarrhea in May 2014 and that the examiner noted a recent colonoscopy was negative, thus advising medication management for Claimant's diarrhea. (Tr. at 17, 889) The ALJ noted that additional testing revealed no acute findings aside from a hiatal hernia. (Tr. at 17, 642)[5] From more recent findings, the ALJ also noted that in December 2017, a treatment record indicated that Viberzi was helping Claimant's diarrhea. (Tr. at 17, 822) The ALJ further noted that in May 2018, a treatment record indicated Claimant had IBS for which medication was continued. (Tr. at

---

[5] The ALJ referenced a treatment note from Marshall Health dated December 7, 2015.

17, 818)[6] Accordingly, the ALJ determined that "[d]espite her allegations of persistent diarrhea, the condition appears to be controlled with medication. In addition, testing has revealed minimal findings." (Tr. at 17) To the extent Claimant argues the ALJ erred by finding her allegation of chronic diarrhea nonsevere, the undersigned **FINDS** that the ALJ provided sufficient explanation for his conclusion concerning the severity of this condition, accordingly, this second step determination in the sequential evaluation process is supported by substantial evidence.[7]

Evaluation of Symptoms in Disability Claims:

Claimant has argued in a conclusive fashion that the ALJ "did not fairly and reasonably evaluate [her] credibility in light of the medical evidence of record considered in its totality." (ECF No. 13 at 6)

Social Security Ruling ("SSR") 16-3p[8] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and

---

[6] This treatment record is actually from March 2018, though it indicates that Claimant's medications were continued, including dicyclomine hcl 10 mg for cramps and diarrhea as well as Viberzi. (Tr. at 819); notably, the treatment record from May 2018 also indicates that both these medications were refilled (Tr. at 814, 815) and that a review of systems indicates Claimant experienced no nausea, vomiting, "bright red blood per rectum", melena, diarrhea, or constipation (Tr. at 812). A subsequent treatment record from June 2018 also indicates that Claimant denied having any these issues (Tr. at 808).

[7] On judicial review, the Commissioner's factual findings are " ' conclusive' if supported by 'substantial evidence.' " See Biestek v. Berryhill, 139 S.Ct. 1148, 1153 (2019). Given that substantial evidence is "more than a mere scintilla" and "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1154 (internal quotation omitted).

[8] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms.
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ thoroughly reviewed Claimant's alleged conditions and impairments, and how they impacted her ability to function throughout the written decision. The ALJ recognized Claimant's complaints regarding her neck and low back pain, noting she alleged that she had suffered from this condition for "many years that has continued to increase in severity over the intervening time." (Tr. at 21) He noted from Claimant's applications for benefits[9] and her testimony that her low back pain now radiates into her legs and causes spasms, that she is prescribed medications, but they make her dizzy at times, causing her to lie down five to ten times a day; he also noted she alleged tingling and numbness in her hands that cause her to drop things, despite having undergone a carpal tunnel release a few years prior. (Id.) The ALJ also recognized Claimant's complaints concerning migraines, which she said occur every other month, requiring her to lie down in a dark room until they pass; he also noted her stomach issues, including her complaints of chronic nausea, stomach pain and frequent vomiting. (Id.)

The ALJ continued to note that secondary to these combined conditions, Claimant stated she was unable to sit for long because of stomach pain; walk over two blocks; stand over five to

---

[9] Though the ALJ cites Exhibits B3E and B5E, these do not appear to reflect Claimant's alleged subjective complaints, but rather Exhibit B6E, Claimant's Function Report (Tr. at 342-349).

ten minutes; or lift over ten pounds; as well as her allegations having trouble squatting, kneeling, using her hands, and climbing stairs. (Tr. at 21, 342-349) He noted that Claimant reported her chronic pain affects her ability to sleep throughout the night, making her take frequent naps throughout the day. (Id.)

The ALJ also recognized Claimant's allegations of having flashbacks and nightmares related to the abuse she suffered as a child and that she has problems with depression and anxiety that affects her ability to deal with others, and she often feels irritable. (Id.) Also taken into consideration was Claimant's allegations of having crying spells and unable to get out of bed for days at a time, which cause her trouble in concentrating, remembering, understanding, following instructions, and completing tasks. (Id.)

Next, following his review of the objective medical evidence of record, the ALJ performed the requisite credibility/consistency analysis endorsed by Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1995). (Tr. at 21-24) As noted by Claimant, the ALJ determined that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" and highlighted the aspects that undercut her allegations of totally disabling symptoms. (Tr. at 25-27) While the ALJ acknowledged Claimant had neck, back, and leg pain for many years, he observed that "the record did not indicate any strength deficits, circulatory compromise, neurological deficits, fasciculations, fibrillations, or muscle atrophy or dystrophy, which are often association with long-standing, severe or intense pain and physical inactivity." (Tr. at 25). Additionally, the ALJ noted that Claimant uses no assistive devices, her neurological examination was normal, and her musculoskeletal examination shows no swelling, effusion or deformities. (Id.) With respect to her

stomach issues, the ALJ noted that testing revealed minimal findings and that Claimant "has often failed to follow up with recommended referrals and prescribed medication", and that she also "felt her stomach issues were being caused by her nerves." (Id.)

With respect to her mental health issues, the ALJ acknowledged Claimant had complaints for many years and that they, too, affect her ability to function, "[h]owever, she has told her examiners that she has had increased depression and anxiety as a result of marital issues and her children's problems." (Tr. at 24-25) The ALJ specifically observed that in February 2016, she reported to an examiner that she was leaving her husband, "as she felt he was a 'big source' of her problems." (Tr. at 25, 847) The ALJ also considered Claimant's history of being "less than compliant with her recommended course of treatment for her mental health issues": in February 2017, she admitted she stopped taking Seroquel due to its side effects (Tr. at 25, 464); in April 2017, she admitted she stopped taking Abilify because she felt it did not help, and declined any new medications because "she was 'in and out of town' now due to her mother's health" (Tr. at 25, 472); in June 2017, an examiner noted Claimant had not attended counseling since August 2015, and that she "displayed a 'lack of participation' in her treatment program" (Tr. at 25, 505); and in November 2017, a provider noted she stopped taking Celexa and Klonopin "suddenly", and Claimant advised she did not like Lexapo "as it made her 'more crazy than she already was' " (Tr. at 25, 827).[10]

Additionally, the ALJ determined that despite her numerous complaints, Claimant is able to perform her activities of daily living without any problems, including performing simple household chores, prepare simple meals, and grocery shop; he further observed that "although she

---

[10] It is noted that none of the reasons Claimant reported to her treating providers would be considered "a good reason for not following treatment" under 20 C.F.R. §§ 404.1530, 416.930.

said she spends days in bed due to depression and does not like to leave the house, it appears she was traveling out of town frequently to visit with her mother." (Tr. at 25)

Ultimately, the ALJ found "a review of the medical evidence reveals that the claimant has no objective basis to support the severity of her alleged physical limitations and pain and mental health issues", and that determined that with respect to Claimant's statements concerning her impairments and their impact on her ability to work, they were inconsistent with her activities of daily living, the clinical findings, and course of treatment. (Id.)

In Hines v. Barnhart, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d at 595).

Recently, the Fourth Circuit emphasized the adjudicator's role in evaluating subjective symptoms: "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to

engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting Claimant's complaints.

The foregoing demonstrates that the ALJ in this case did not overinflate Claimant's capabilities while ignoring the evidence tending to support her allegations of functional limitations; the ALJ herein did not make factual misrepresentations or misinterpretations of the evidence of record in order to make a nondisability finding. Indeed, given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d at 589. In this case, it appears that the ALJ paid close attention to the objective medical evidence from the relevant period, which included Claimant's reports concerning her pain and other symptoms, or lack thereof, as well as what helped her pain and other symptoms, and what did not relieve them; the ALJ then compared this evidence to Claimant's current allegations of pain and other alleged symptomology. In short, the ALJ's discussion involved a thorough review of the conflicting medical and other evidence requiring some reconciliation. Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ did not fairly and reasonably evaluate her "credibility" against the evidence of record lacks merit, the undersigned further **FINDS** that the ALJ's assessment of Claimant's subjective complaints is

supported by the substantial evidence.

Evaluation of Medical Opinion Evidence:

As noted *supra*, Claimant also appears to argue that the light RFC assessment is erroneous insofar as Claimant's allegations are corroborated by the objective medical record, and more specifically, tend to be supported by the diagnoses and opinion evidence provided by the consultative examiners and her treating source, Alicia Johnson, PA-C. (ECF No. 13 at 6) To the extent that Claimant argues that the ALJ failed to properly evaluate these experts' opinions, the undersigned notes that the ALJ explicitly applied the regulatory framework pursuant to Sections 404.1520c and 416.920c to claims filed after March 27, 2017. (Tr. at 20) It is also clear that the RFC assessment lies squarely with the ALJ, not with any medical provider/examiner. 20 C.F.R. §§ 404.1546(c), 416.946(c); see Felton-Miller v. Astrue, 459 F. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC."). In addition, the applicable Regulations provide that a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). The Regulations also define "findings . . . about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review" as "prior administrative medical finding[s]." Id. at §§ 404.1513(a)(5), 416.913(a)(5).

In this case, the ALJ properly applied Sections 404.1520c and 416.920c, which emphasize the supportability and consistency factors when assessing the persuasiveness of the medical opinions of record; moreover, an adjudicator in not bound to give any specific weight or deference

to any medical provider's opinion, including those provided by treating sources. Id. §§ 404.1520c(a), 416.920c(a). Instead of assigning weight to medical opinions, the ALJ now just considers the persuasiveness of a medical opinion (or a prior administrative medical finding). Id. Critically, the source of the opinion is not the most important factor in evaluating its persuasive value, instead, the most important factors are supportability and consistency. Id. §§ 404.1520c(b)(2), 416.920c(b)(2). When discussing the finding about whether an opinion is persuasive, the ALJ need only explain how he considered the "the most important factors" of supportability and consistency. Id. §§ 404.1520c(c), 416.920c(c). The ALJ "may" comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. Id. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3).

With regard to the opinion evidence, the ALJ first addressed the state agency medical consultants' opinions, and explicitly found the opinion at the initial level of review not persuasive, as it was not consistent with the objective evidence of record and the prior ALJ's severe impairment findings. (Tr. at 25, 76-90) With regard to the medical opinion from the reconsideration level of review, however, the ALJ found it persuasive only to the extent that "there was insufficient evidence to establish a condition prior to the date last insured", as "the treatment history does not indicate extensive treatment during that time period." (Tr. at 25, 108-123) Next, the ALJ considered Dr. Beard's findings, and determined they were persuasive, specifically Claimant's normal range of motion of her spine, and that her lungs were clear, noting that "there is no evidence of material worsening of [her] conditions in this regard." (Tr. at 25, 513-523)

Finally, concerning Claimant's treating source opinion, the ALJ determined that neither of Ms. Johnson's statements were persuasive. (Tr. at 25-26, 608, 745) The ALJ explained that Ms.

Johnson did not related her opinion to objective findings and there was nothing in the record indicating that she was qualified to make a mental health assessment. (Tr. at 26) The ALJ also recognized that opinions as to disability and not given controlling weight and concerns issues reserved to the Commissioner. (<u>Id</u>.) The ALJ stated Ms. Johnson's opinions were nevertheless considered, but found them not persuasive because they were not consistent with Claimant's treatment history and her findings were unsupported by the weight of the evidence. (<u>Id</u>.)

The ALJ also considered the state agency psychological consultants' opinions[11], and found them persuasive because "they are balanced, objective, and consistent with the evidence of record as a whole"; the ALJ also acknowledged that while these experts did not examine or treat Claimant, their reports reflect a thorough review of the record and were supportable. (<u>Id</u>.) The ALJ also noted that the limitations set forth therein were supported by the weight of the evidence as discussed in Claimant's treatment history with Prestera, observing that it "often noted she had normal mood, affect, and memory during the examinations, despite the fact she was often noncompliant with the recommended course of treatment." (<u>Id</u>.)

With respect to Ms. Wilson's consultative examination report, the ALJ did not explicitly determine whether any opinion therein was persuasive or not, however, as noted *supra*, he was not obligated to do so pursuant to the Regulations governing this decision. Nevertheless, the ALJ did expressly consider the findings in Ms. Wilson's report, including her assessment of major depressive disorder and PTSD, as well as Ms. Wilson's noting Claimant's complaints of loss of interest, irritability, crying spells, hearing voices, as well as her flashbacks and nightmares connected to her sexual abuse as a child. (Tr. at 23-24, 507-512) The ALJ also considered Ms.

---

[11] Both experts opined Claimant is able to learn, remember, and perform routine work-like activities involving 1- and 2-step instructions in setting that do not require meeting production line schedules. (Tr. at 87, 102, 120, 136)

Wilson's report that Claimant presented as neatly and casually dressed, with good grooming and hygiene, normal posture and gait, interacted appropriately during the exam, and was cooperative, although appearing somewhat angry and raised her voice at times. (Tr. at 24) The ALJ also noted Ms. Wilson's observations that Claimant had normal memory, concentration, and pace, and average persistence. (Id.)

In any event, the ALJ discharged his duty pursuant to the Regulations concerning the opinion evidence, noting how the opinions were supported by the evidence of record, while recognizing where they fell short of supportability; in addition, the ALJ reconciled where the opinion evidence was consistent and inconsistent with the overall record. In sum, the ALJ provided a thorough and adequate explanation for how he found the opinions persuasive or not, and properly considered them and incorporated them to the extent he found them supportive and consistent with the record in his RFC assessment. Accordingly, the undersigned **FINDS** the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

The RFC Assessment and Hypothetical Questions to the Vocational Expert:

Claimant also asserts that "it is difficult to understand how" the ALJ arrived at the light RFC assessment, given her severe mental and physical impairments, and conclusively states that "[i]t is more reasonable to conclude" that she is precluded from all exertional levels of substantial gainful activity. (ECF No. 13 at 6)

A claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the

basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. Id. §§ 404.1546(c), 416.946(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller, 459 F. at 231.

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided a comprehensive review of the record evidence, which included Claimant's testimony and subjective statements, her activities of daily living, the objective medical findings, her treatment history, and the medical opinion evidence (Tr. at 21-26); the ALJ also explicitly stated "any non-severe impairment is taken into account in assessing the claimant's residual functional capacity." (Tr. at 17)

As noted supra, although Claimant summarily contends the ALJ did not consider her numerous conditions, she merely lists the various diagnoses throughout the record without any specific identification as to a related functional loss. See Gross, supra. Regardless, the ALJ did

accommodate Claimant's credibly established limitations resulting from her impairments in the hypotheticals to the vocational expert by restricting her as provided in the controlling RFC, *supra*. (Tr. at 20, 27)

In light of Claimant's argument that the ALJ "should have accepted the testimony of the Vocational Expert who stated that [Claimant] is incapable of substantial gainful activity if [Claimant] is absent from work more than one (1) day per month or is off-task more than ten percent (10%) of the normal workday" (ECF No. 13 at 6, citing Tr. at 72-73), it is noted that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. While the ALJ determined "that there is no support in the record for a finding that the claimant would be off task 10% of the workday due to her severe impairments" as previously determined by the prior ALJ (Tr. at 27, 142-162), the ALJ herein did consider Claimant's need for restroom breaks by specifically asking the VE about employer tolerances for such matters. (Tr. at 72) Indeed, the VE testified that usually there is not a "tolerance" *per se* concerning restroom breaks, but is more appropriately translated in terms of "production"; the VE further opined that if Claimant were to be off task more than ten percent of the workday, then it "would probably begin to be an accommodation", or alternatively, Claimant would not be able to perform any jobs in the national economy. (Tr. at 72-73) As noted *supra*, the ALJ found there was no support in the record that Claimant would be off task ten percent of the workday, but did further restrict Claimant's previous RFC assessment to light exertional work because of her neck, back, and stomach pain. (Tr. at 26-27)

In short, while Claimant asserts that the ALJ should have adopted the VE's testimony with respect to her missing one day of work a month and/or having to use the restroom every two hours, the ALJ was not obligated to accept this portion of the VE's testimony; as the ALJ determined, based on the overall evidence of record, there was insufficient support for such limitations. Accordingly, the undersigned **FINDS** that the VE's responses to the ALJ's controlling hypothetical question(s) were supported by substantial evidence, and further **FINDS** that the ALJ did not err by not adopting assumed limitations that were not supported by the record.

Finally, regarding Claimant's argument that the ALJ erred by failing to find that she "grids out" on her fiftieth birthday pursuant to the Medical Vocational Guidelines, Rules 201.09 or 201.10[12](ECF No. 13 at 7), Claimant does not explain or identify how the cumulative effect of her impairments would at least limit her to sedentary work.[13] While there is no dispute that Claimant would fall within the particular vocational factors endorsed by these Rules, as explained by the ALJ in this case, *supra*, based on her impairments and her functional limitations observed by the medical and other evidence of record, Claimant remained capable of light exertional work, therefore, she would not "grid out."

Although Claimant advocates for an alternate decision, as already stated herein, such are matters necessarily involving the resolution of conflicts in the evidence of record, and are

---

[12] Pursuant to Rules 201.09 and 201.10, claimants are deemed "disabled" who belong in the age category of "person closely approaching advanced age", have an education classified as "limited or less" (the SSA considers a 7th grade through 11th grade level of formal education to be a "limited education" per 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3)), and with previous work experience that is classified as unskilled or none, or skilled or semiskilled but the skills are not transferable.

[13] Claimant also endorses "a partially favorable decision", however, this argument is neither explained, nor does Claimant identify how a partially favorable decision would be appropriate in this case. To the extent that Claimant is arguing that the ALJ should have found her disabled as of a certain onset date, the ALJ would have had to first found or inferred that Claimant had a disabling impairment or impairments – and should the onset date be ambiguous, then consult a medical adviser; in any event, this did not occur in the case at bar. See, generally, Bailey v. Chater, 68 F.3d 75 (4th Cir. 1995).

evidentiary findings within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she could perform light exertional work with certain limitations, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, such as imaging and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and the ultimate determination that Claimant remained capable of performing light work provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at [her] conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637. Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment as well as the controlling hypothetical questions to the vocational expert were based upon substantial evidence.

Finally, the undersigned further **FINDS** that the ALJ's analysis of the evidence of record, and the final decision denying Claimant's applications for benefits are also supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 13), **GRANT** the Defendant's request to affirm the decision below (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 7, 2021.



Omar J. Aboulhosn
United States Magistrate Judge